Filed 8/21/25  In re V.V. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re V.V., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E085535 |
| Plaintiff and Respondent, | (Super.Ct.No. J301608) |
| v. | OPINION |
| J.S. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Jenie S. Chang, under appointment by the Court of Appeal, for Defendant and Appellant J.S.

Emily Uhre, under appointment by the Court of Appeal, for Defendant and Appellant I.V.

1

Tom Bunton, County Counsel, Landon Villavaso, Deputy County Counsel for Plaintiff and Respondent.

Defendant and appellant J.S. (Mother) appeals from the juvenile court's order terminating her parental rights to V.V. (a boy, born in Jan. 2024; hereafter, Minor). (See Welf. & Inst. Code, § 366.26.[1]) Mother contends the juvenile court abused its discretion by denying her modification petition (§ 388) without an evidentiary hearing. Mother also argues she satisfied the benefit exception to termination of parental rights. Defendant and appellant I.V. (Father) joins in Mother's arguments; he adds none of his own, but requests reinstatement of his parental rights with Mother's, if she prevails. As we explain *post*, we find no merit in Mother's contentions. We therefore affirm the juvenile court's order.

## BACKGROUND

Mother came to the attention of plaintiff and respondent San Bernardino County Children and Family Services (the Department) approximately 20 months before Minor was born, based on allegations of severe neglect involving her then one-year-old son, M.M. M.M.'s father brought him to a clinic when Mother refused to do so despite the child's prolonged suffering from fevers, congestion, coughing, and constipation for weeks. M.M. had gained less than 10 pounds since birth. He was diagnosed with "non-organ failure to thrive." Mother had not taken M.M. to wellness checks or doctor appointments; she and the child's father also had a history of domestic violence. The juvenile court sustained the Department's dependency petition, ordering reunification

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

services for the parents, which the court later terminated for the father for lack of compliance.

Over the course of almost a year, Mother made sufficient progress in her services to transition to a family maintenance plan. The court, however, warned Mother in returning M.M. to her care that she was required to report to the Department "any changes in family composition, [her] residence or any adult residing in the home." Mother ignored the requirement. She also violated visitation restrictions concerning M.M.'s father.

The Department became aware of Minor's birth when a social worker made a monthly family maintenance visit to Mother's apartment. An unknown man, whom Mother later said was her boyfriend, answered the door; the worker heard a baby crying inside, but Mother was not home. When Mother returned, she admitted she had recently given birth to Minor. She had previously denied for months that she was pregnant. She would not provide a name or date of birth for Minor, nor identify Minor's father, nor furnish any identifying information about the boyfriend. When the social worker reminded Mother of her obligation to keep the Department informed of household changes or any adult living in the home, Mother became upset and raised her voice in disagreement. She claimed she did not have to disclose anything related to Minor because the dependency involved M.M., not Minor.

The next month, the Department learned Father's identity and that a search warrant related to Father's arrest had been executed at Mother's apartment. The officers found ammunition in the home, as well as shell casings, bail paperwork, and a carrying

case for an automatic rifle. The police report logged 28 rounds of ammunition from Minor's room, but Mother denied they were discovered there. Mother also minimized the items recovered, asserting that only a necklace, paperwork, and a plastic scope for a toy gun were found. A background check revealed Father had an extensive and violent criminal history.

Mother claimed she no longer associated with Father, but that was untrue. Mother moved, but did not inform the social worker, who found her old apartment vacant. The social worker learned in attempting a monthly visit at Mother's new residence that Mother had departed earlier with Father, taking Minor and M.M. out with them. The social worker questioned whether Mother benefited from the services she had received. The worker noted the Department's concern regarding Mother's "lack of protective capacity," "uncooperative" behavior, and "disregard [of] Court orders." The Department obtained and executed a protective custody warrant for Minor and M.M in July 2024. Mother acted erratically when the warrant was served; she disclaimed responsibility and asserted to the assisting peace officer that the social worker fabricated lies against her.

The Department filed a dependency petition as to Minor. (§ 300, subd. (b)(1) [failure to protect], (j) [abuse of sibling].) At the detention hearing, the juvenile court upheld Minor's continued placement in foster care. Concurrent planning in M.M.'s separate dependency proceedings resumed following Mother's failed attempt at family maintenance. Minor and M.M. remained placed together in a foster care resource family home.

4

Investigation revealed that Father's criminal history included a conviction for robbery (Pen. Code, § 211) and further charges or convictions for robbery and assault with a deadly weapon (Pen. Code, §§ 211, 245, subd. (a)(1))), with enhancement allegations for having committed one or more prior serious or violent felony offenses (see, e.g., Pen. Code, § 667, subd. (a)(1)). Father also had recently been arrested for battery with serious bodily injury (Pen. Code, § 243, subd. (d)) and for elder or dependent adult abuse likely to cause great bodily injury or death (Pen. Code, § 368, subd. (b)(1)). Father later acknowledged he was convicted of an unspecified prior violent felony in 2019.

Mother's reunification and family maintenance services had included parenting education and counseling, but, according to the Department, Mother's actions showed she had not learned to protect the children. In its report for the jurisdiction and disposition hearing, the Department recommended against reunification services for Mother because Mother failed to successfully reunify with Minor's sibling, M.M., within statutory time limits. Despite the prior services, Mother "did not demonstrate behavioral changes that would guarantee the safety and well being of [Minor] if left under [her] care."

In early August 2024, at a supervised visit a month before the jurisdiction hearing, Mother erupted in rage and threatened a social worker. The visit started poorly, with Mother refusing to review or sign a release regarding renewed reunification services pending the disposition hearing. Mother rebuffed the social worker's attempt to explain the necessity of the release. The visit devolved further when the children's caregiver arrived at the end of the visit; M.M. began to cry, yell and hold on to Mother. The social

5

worker agreed that Mother could walk M.M. to the lobby, but then Mother ignored the lobby restriction and continued with M.M. out to the parking lot. Mother attempted to place M.M. into his car seat in the caregiver's car, but M.M. rejected her assistance.

Mother became erratic and upset. She insulted the social worker with sexually charged threats. Mother advanced on the social worker and blocked her path when the worker tried to move away. She threatened the worker: "I'm going to fuck you up" and "Don't let me see you on [the] streets." Fearful for her safety, the social worker obtained the assistance of a security officer to end the visit and law enforcement was called. Mother still received the rest of her visits in August, which remained monitored and were without incident; she was attentive to the needs of both children.

On September 12, 2024, the juvenile court held a combined jurisdiction and disposition hearing. Minor's counsel recommended that the juvenile court sustain the petition. Following argument by the Department, Mother, and Father, the court found the following allegations true and assumed dependency jurisdiction over Minor. Regarding Mother's failure to protect Minor (§ 300, subd. (b)), the court found Mother had a history of engaging in domestic violence that "interferes with her ability to adequately parent the child," placing Minor "at risk of abuse and/or neglect." Also pertinent on that ground, the court found Father engaged in "extensive" criminal activity. The court further highlighted Mother's tendency towards violence in sustaining jurisdiction based on abuse of a sibling. (§ 300, subd. (j).) The court found that the "concerns presented in [M.M.]'s removal" and concurrent proceedings were similarly based on domestic violence, placing Minor too, like M.M., "at significant risk of abuse and/or neglect."

6

At the disposition hearing, Minor's counsel concurred in the Department's recommendation against reunification services. Minor's counsel explained regarding Mother: "Mother's violations of the Court orders and her bad behavior in [both] her children's cases [amounts to] gross noncompliance with the Court's orders"; according to Minor's counsel, Mother "failed to show that she has benefitted from services in her prior case" with M.M.

The court agreed as to both parents. The court denied reunification services for Father under section 361.5, subdivision (b)(12) [parent or guardian convicted of a violent felony].) Regarding Mother, the court found another attempt at reunification services with Minor unwarranted under section 361.5, subdivision (b)(10), given Mother's failure to reunify with M.M. The court explained that "[w]hen [M.M.] was removed from [M]other's care, that would be the time" for Mother to begin "to provide evidence that she has made reasonable efforts to overcome the [same] problems that led to [M.M.'s] removal." To the contrary, however, M.M. "has been removed two times from [M]other at this point," indicating "she has failed to benefit from services."

Over the span of both dependencies, Mother failed to follow court orders or social worker guidance for the children's protection. The court noted, "Even up until September 6th," the week before the hearing, "it's been reported that [Mother] was trying to bypass the Department [by] requesting [of] the caregiver [that she] bring the children to her on the weekend and not tell the Department." The court further highlighted its concern that Mother "is also advising the caregiver not to ask for adoption but rather legal guardianship so she can somehow do an end run around . . . the Court's orders in

7

order to have the children returned to her without demonstrating any capacity or ability to properly care for the children." The court set a permanent plan selection and implementation hearing (§ 366.26; hereafter .26 hearing) for January 10, 2025.

The .26 hearing was continued when Mother filed a modification petition. (§ 388.) Mother sought in her petition to set aside the court's September 2024 order denying reunification services. The court denied the petition without an evidentiary hearing. In written comments, the court explained why a hearing was unnecessary. Specifically, while domestic violence had been central to the children's respective dependencies, Mother gave no indication she took steps to address the problem, such as by "provid[ing] evidence that she completed domestic violence classes." The court found Mother's evidence therefore suggested only "changing circumstances [and] not changed circumstances."

Mother then amended and refiled her modification petition. She again stated that since the court's order terminating reunification services, she had completed parenting and anger management classes and participated in further counseling sessions. She amended her petition by stating that the counseling "included thorough discussion on DV and choosing the wrong men (see counseling report)." Mother asserted she had thus "addressed DV concerns that led to removal and TFR," i.e., Termination of Family Reunification. She noted she had decided to abstain from romantic relationships; she also stated she had no contact with Father and that she never missed a visit with the children. Mother contended that reopening reunification services would be in Minor's best interests based on these changes and because Minor had been in her care "the entirety of his life

8

until" he was removed; furthermore, he was attached and bonded to her, as was M.M. She did not address her role in any past incidents of domestic violence or other altercations.

The court scheduled a hearing to determine whether Mother established a prima facie case to change the no-reunification order. In the meantime, the Department interviewed Mother, who reported that she was homeless but employed full time and working the night shift at a warehouse. She stayed with friends or periodically at motels. The social worker was able to verify two motel stays, including one in which—just before Mother amended her modification petition—Mother was "kicked out" of the motel "due to being involved in a[n] assault with an African American male." The police responded to the scene, but Mother and the man had already left.

While Mother stated she had no contact with Father, the social worker noted her contrary history of continuing that relationship despite her "case plan and possibility of hindering reunification." Mother reported growth through her anger management class and counseling sessions in identifying personal "triggers" and then using coping skills to calm herself. She stated she accepted accountability for her role in Minor's removal from her care, identifying her "choice of partners as the only factor." Her plan to ensure Minor and M.M.'s safety consisted of "keeping the boys with her, maintain[ing] a low profile, and prioritizing their care and well-being." She anticipated things would "be different this time" because "it will just be the 3 of them." Mother was "vague with her responses regarding the benefit of services."

At a visit with the children in early January, Mother again lashed out at a social worker. Mother was upset because her third-party visitation facilitator scheduled two make-up visits at the Department instead of at its premises, pursuant to the center's internal policy for make-up visits. Mother began yelling and accused the social worker, "You like taking people's children away, that's sick. I am a good mother, and you know it, this is all because I don't do background checks on who I lay with." Mother threatened to withhold visiting her children if they were not at her preferred location: "If I can't make the visits up at Bittersweet Encounters, then you can forget about it."

Mother's outburst occurred in front of the children. The Department recommended against granting Mother's modification petition. Despite years of services, Mother continued "to be involved in domestic violence relationships" and remained "aggressive and hostile towards her peers and the Department." The Department noted Mother "failed to change her patterns of behavior" or "take accountability for the safety threats that led to [Department] and Court involvement." Instead, Mother still "present[ed] herself as a victim of mistreatment by the Court and the Department."

At the prima facie hearing on Mother's modification petition, Minor's counsel opposed an evidentiary hearing as unnecessary. Minor's counsel revisited several of the incidents in the record and concluded that, while Mother "has done a number of services; however, she has not shown any benefit." The Department similarly expressed concerns regarding "who Mother associates with and . . . her veracity, her protective capacity, and her anger management." The Department acknowledged Mother "wants to subpoena [her] therapist to get more information about this," but argued Mother's showing of

10

reform based on completing classwork and engaging in therapy "does not overcome the conduct and behaviors that Mother has been exhibiting."

Mother's counsel sought an evidentiary hearing to have Mother testify to bolster her claims in her petition and to have Mother's therapist testify to add to, as Mother's counsel described it, the therapist's "very, very thorough report." Mother attached the report to her modification petition. Father submitted in support of Mother's petition.

The juvenile court reviewed Mother's claims of reform in her amended petition, including by quoting substantial excerpts from her therapist's progress report. The court concluded Mother failed to establish the requisite prima facie showing for an evidentiary hearing. The court found Mother's petition, viewed in light of the record in the case from beginning to end, did not show that an evidentiary hearing or "any further hearings" would be useful in determining whether circumstances had changed sufficiently that ordering reunification services again would be in the children's best interests. The court denied Mother's petition.

The court then held the .26 hearing, at which several witnesses testified, including Father, a social worker, Mother, and the visitation monitor. Following the testimony, counsel for Mother advanced an exception to termination of parental rights commonly known as "the benefit exception," based on a beneficial parent-child relationship. (§ 366.26, subd. (c)(1)(b)(1).) Minor's counsel argued against the exception. The juvenile court found the exception did not apply, determined that Minor was adoptable, identified adoption as the likely permanent plan for Minor, and terminated parental rights.

11

## DISCUSSION

Mother contends the juvenile court erred in denying her modification petition without an evidentiary hearing and in finding against her invocation of the benefit exception.  We address these claims in turn; neither has merit.

"Section 388 allows an interested person to petition the juvenile court for a hearing to change, modify or set aside a previous order. . . .  The burden of proof is on the petitioner." (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423.)  "The parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing.  [Citation]'  [Citations.]  There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

" 'A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause.  [Citations.]  It is not made, however, if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing. . . .  In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.Aplp.4th 52, 61-62.)

We review a juvenile court's denial of a modification petition without an evidentiary hearing for abuse of discretion.  (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711.)  This standard is generally "highly deferential to the decision maker," requiring "a showing that the decision was 'so irrational or arbitrary that no reasonable person could

agree with it.' " (*In re M.L.* (2012) 205 Cal.App.4th 210, 228.)  Nevertheless, " 'a court abuses its discretion when it applies incorrect legal standards.' " (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1301.)

Mother asserts as an initial basis for reversal that the juvenile court applied the wrong standard in denying her petition.  She contends the court overlooked the prima facie standard and set her requisite showing to proceed to an evidentiary hearing at the comparatively higher standard of a preponderance of the evidence.  Instead, all that is required is probable cause that the changed circumstances and best interests prongs may be met.  (*In re K.L.*, *supra*, 248 Cal.App.4th at p. 61.)

We are not persuaded that the juvenile court erred as Mother suggests.  The court made reference to the preponderance of the evidence standard, which we construe to have been regarding what was necessary for her to ultimately prevail on her modification petition.  (See, e.g., Cal. Rules of Court, rule 5.570(h)(1)(D) [petitioner bears burden of proof by a preponderance of evidence].)  The court recognized the question before it was whether to "grant or deny an evidentiary hearing" on Mother's petition, not whether to grant or deny the petition itself, which would require the preponderance of evidence showing.  We presume the court knew and properly applied the governing law, including the prima facie standard for the initial question of whether to hold an evidentiary hearing.  (Evid. Code, § 664; see *J.H. v. G.H.* (2021) 63 Cal.App.5th 633, 644 [juvenile court's "failure to 'discuss' a particular standard does not imply it applied an incorrect standard"].)  In particular, in denying an evidentiary hearing the court explained it was also denying "any *further* hearings" (italics added), which indicates the court understood

that a further evidentiary hearing on the petition was only necessary if Mother met her initial prima facie burden at the current hearing. We therefore find no merit in Mother's challenge.

Next, we address Mother's claim that she made the requisite changed circumstances and best interests showing to warrant an evidentiary hearing. She did not make a prima facie showing on either prong.

"[G]eneral, conclusory allegations" do not make a prima facie case. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.) Demonstrating " 'changed circumstances' " requires addressing the reason or reasons for dependency. (*Id.* at p. 592; see *id.* at p. 593 ["the treatment received by the father did not address sexual abuse," a primary reason for the children's dependency there].) The requisite "change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

Here, unlike Mother's initial modification petition, which the juvenile court properly denied summarily, her amended petition at least referenced domestic violence. In addition to Mother's severe neglect of Minor's sibling, M.M., Mother's history of domestic violence was the primary reason for Minor's dependency. Neither Mother's amended petition, however, nor the report she attached from her therapist suggested a change of circumstances in which Mother recognized *her* role in recurring altercations.

Mother was the constant in these altercations, though her partners changed. Yet her petition indicated that what she took away from her completed parenting, anger management, counseling sessions, and "thorough discussions on DV" was that the problem was "choosing the wrong men." The therapist's report confirmed this was

14

Mother's understanding. The report stated Mother now grasped "how it looked to have someone with a criminal history with her infant," reiterated that "she had not chosen safe men to be around her children," realized she had to "take more responsibility for who she chooses to . . . have her family exposed to," and she even resolved "not to date while her children are little." Mother told the social worker she accepted accountability for her role in Minor's removal from her care, but identified her "choice of partners as the only factor."

The therapist's report similarly included general references to Mother taking "full accountability and responsibility for her part in the removal of her children," but the specifics indicated, as noted, that Mother viewed others as the sole problem. Mere participation in services is not enough to regain reunification (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483-1484), nor do general, conclusory allegations of change require an evidentiary hearing (*In re Edward H.*, *supra*, 43 Cal.App.4th at p. 593). This is particularly true where the asserted changes, such as completing courses or engaging in therapy, did not address Mother's root cause role (see *ibid.*) in the domestic violence altercations. Nor did Mother's petition anywhere address the fact that similar violent outbursts kept happening—in threatening conduct towards the social worker, with a male individual at the motel, and again in another incident with the social worker. The juvenile court aptly found these incidents "greatly disturb[ing]."

A parent's inability to perceive risk from his or her own conduct raises a child's risk of harm. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].) " 'The purpose of dependency

15

proceedings is to prevent risk, not ignore it.' " (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

Notably, the therapist's report acknowledged at its outset that one of Mother's risk factors was "Homicidal Impulse Control." But nothing in the report or otherwise in Mother's petition suggested *Mother* was cognizant that such powerful impulses lay inside of her, nor—most importantly—that she had made changes commensurate with the risk. The report stated only that Mother knew she sometimes became "upset" and considered "hot showers" or similar means of coping, but again, it was because she was triggered by others. The juvenile court could reasonably conclude Mother did not make a probable cause showing of substantially changed circumstances. She did not acknowledge or begin to suggest she could put a stop to her own recurring violent or aggressive conduct, including around her children.

Mother's petition also failed on the second prong for modification. She did not make a probable cause showing that the change she requested—reopening and extending her reunification window with Minor—would be in his best interests.

Mother proffered in her petition that the change would be in Minor's best interests because she was abstaining from romantic relationships, she claimed she severed contact with Father, she "never missed a visit with either child," Minor had been in her care "for the entirety of his life" until taken into protective custody, and she asserted "[b]oth children are attached and bonded with" her.

16

Well-established, relevant factors involved in considering a child's best interests in the context of a modification petition include: (1) the seriousness of the problem that led to the dependency and the reason for any continuation of that problem; (2) the strength of the child's bond with his or her new caretakers compared with the strength of the child's bond with the parent, and (3) the degree to which the problem leading to the dependency may be easily removed or ameliorated, and the degree to which it actually has been. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531-532.)

Additionally, two other factors were critical to Mother's petition—time and stability. Time was of the essence both in relation to Minor's age and the advanced stage of the proceedings. The default reunification period for a child entering dependency under age three is just six months. (§ 361.5, subd. (a)(1)(B).) " '[V]ery young children . . . require a more timely resolution of a permanent plan because of their vulnerable stage of development." (*Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 612.) In other words, " 'given the unique developmental needs of infants and toddlers, moving to permanency more quickly is critical.' " (*Ibid*.)

Moreover, the question of best interests has a special focus when a parent seeks a change of order "on the eve of the .26 hearing" (*In re J.C.* (2014) 226 Cal.App.4th 503, 526), as Mother did here. Once the juvenile court "has . . . terminated reunification services and set the matter for a section 366.26 hearing, the focus of the case shifts from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability." (*In re N.F.* (2021) 68 Cal.App.5th 112, 121.) Thus, a modification petition at that point in the proceedings "for either an order

17

returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*J.C.*, at p. 527; see *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1507 ["minors' need for stability, continuity, and permanency" becomes "the overwhelming consideration of both the juvenile court and [the reviewing] court"].)

Mother's petition did not address Minor's stability interest at all. Mother was homeless and said she worked overnight shifts. While not impossible, she did not suggest how she would arrange evening childcare or otherwise provide permanency and stability for Minor. She already received two years of services in M.M.'s dependency to resolve her propensity to violence, to no avail. At best, " '[a] petition which alleges merely changing circumstances . . . would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, [and] does not promote stability for the child or the child's best interests.' " (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206.)

The court acknowledged Minor spent his first six months with Mother, as she alluded to in her petition, but, at "a little over one year old," Minor had lived as long or longer with the prospective adoptive caregiver. Both Minor and M.M. were thriving with the caregiver, a maternal cousin, who "love[d] them as if they were [her] own." The caregiver and her husband were willing to adopt both children, in which case Minor could remain with his brother. In light of all the foregoing, the juvenile court did not abuse its discretion in finding Mother failed to make the requisite prima facie showing for an evidentiary hearing.

18

We also find no merit in Mother's contention that the juvenile court erred in finding the benefit exception inapplicable.

The goal of juvenile court dependency proceedings is to ensure children have, to the extent possible, "stable, permanent homes." (§ 366.26, subd. (b).) "If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) The purpose of the hearing is " 'to select . . . a permanent plan for the child.' " (*Ibid.*)

" 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53; see § 366.26, subd. (c)(1).) Ordinarily, if the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights." (*Celine R.*, at p. 53.)

There are exceptions to this rule, but they permit departure from " 'the norm' " of adoption only in " 'exceptional circumstances.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) Under the parental-benefit exception, the juvenile court may avoid terminating parental rights if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" (*id.*, subd. (c)(1)(B)(i)).

Under this exception, the parent must "establish, by a preponderance of the evidence," all of the following: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) The first element focuses on whether visitation was regular. The juvenile court found Mother established this element, which the Department does not contest.

For the second element, a parent must establish that he or she has a beneficial relationship with the child and in assessing this prong, "the focus is the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Thus, "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*) As *Caden C.* observed, "[C]ourts often consider how children feel about, interact with, [or] look to . . . their parents." (*Ibid.*) "A parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

For the third element, the juvenile court determines "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) To that end, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child

would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; accord *Caden C.*, *supra*, 11 Cal.5th at p. 631 [adopting these factors and citing *Autumn H.* as "the seminal decision interpreting the [benefit] exception"].)

In *Caden C.*, the Supreme Court held that a parent's inability to reunify with his or her child because of unresolved struggles with addiction or other difficulties does not, by itself, disqualify the parent from invoking the benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 637-642.) To the contrary, the exception still "applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Id.* at p. 630.)

A hybrid standard governs our review. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The first two elements of the benefit exception, namely, consistent visitation and a beneficial relationship, involve factual determinations governed by the substantial evidence standard of review. (*Id.* at pp. 639-640.) The final step, in which the court assesses whether termination of parental rights would be detrimental to the child, is committed to the juvenile court's sound discretion; we therefore review that determination under the deferential abuse of discretion standard. (*Id.* at pp. 640-641.)

With the first prong of *Caden C.*'s analysis conceded by the Department, Mother next contends that substantial evidence supports the existence of a beneficial mother-child relationship. The question on review, however, is not whether "the dependency court could have drawn a different conclusion but whether there is substantial evidence to

support the conclusion that the court did draw." (*In re Noe F.* (2013) 213 Cal.App.4th 358, 366.) Under that standard, "we do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or reweigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's findings." (*In re G.L.* (2009) 177 Cal.App.4th 683, 697-698.)

Mother does not meet her appellate burden. She cites evidence that Minor would stretch out his arms to her on seeing her, that she "joyfully dances and plays with her son" on visits, and the visitation monitor's testimony that Minor was "not indifferent to or detached from" Mother during visits. Mother contends that by visiting Minor every week, she has been "the one and only constant, steady adult that has served in a parental role for [Minor] since the day [Minor] was born."[AOB 50} She asserts that she "has been a part of every step of [Minor's] development even as she also grows and develops as his parent."

Furthermore, blurring her challenge to the juvenile court's findings on the second prong together with the third prong, Mother also argues that the court's "cursory" assessment of her relationship with Minor "resulted in an incomplete and cursory consideration of the third element—whether it would be detrimental to sever [Minor's] relationship with his mother." Mother testified regarding the third element that the harm from terminating her parental rights was based on her and her sons' youth: "[M]y

22

children are young, and I just—I want to be able to have that chance to be a mom. I had my kids at 17, and I'm growing up. I'm only 21 right now."

It is true that the analytic lines "between the prongs of the benefit exception" are not "strict," but instead "naturally inform and lead into each other." (*In re G.H.* (2022) 84 Cal.App.5th 15, 26.) But Mother has the benefit perspective backward. The focus is on the child, not the parent. (*Caden C*., *supra*, 11 Cal.5th at p. 632.) Moreover, by the time of the .26 hearing, the biological parent's interest in companionship with the child gives way to the child's need for permanency. (*In re N.F.*, *supra*, 68 Cal.App.5th at p. 121; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 310 ["Childhood does not wait for the parent to become adequate"].)

The juvenile court correctly observed in finding Mother did not establish the benefit exception that Minor had spent as much or more time in his adoptive caregivers' home as with Mother. Mother provides no evidence for her claim that she was there for Minor for important milestones. Minor *did* reach for Mother on visits, but that was after initially seeking the caregiver; he also reached up to other visiting adults.

It can be difficult for a parent out of custody to show a bond with young children that is unique or of special benefit to preclude terminating rights. (See *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1420 [many toddlers are naturally cuddly, effusively loving, and affectionate].) Still, the parent must show more than that the child "would derive *some* benefit from continuing a relationship maintained during periods of visitation." (*In re Angel B*. (2002) 97 Cal.App.4th 454, 466.) Friendly or affectionate visits are not enough. (*Id.* at p. 468.) The necessity of a "*substantial*, positive emotional attachment"

23

(*id.* at p. 466) follows from the fact that the benefit exception is established only if "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

The juvenile court, like Mother, assessed the second and third prongs of the benefit exception together. The court summarized: "The issue for the Court is, is there insufficient evidence, based on testimony and what is reflected in the reports that there is a relationship between the mother and [Minor] the continuation of which would benefit the child such that termination of parental rights would be detrimental to the child." The court observed that there was no "fussiness" by Minor at the close of visits, which Mother explains by the fact that the child was usually sleeping. But the court also found, "There's no emotional d[y]sregulation. There's no testimony or information contained within the reports that [Minor] is experiencing any issues after the visits, which would have been documented. [¶] So the Court is finding that the mother has not met her burden of proof as to the second and third element [of] *In re Caden C.*; the Court is finding that this is not an exceptional case, which would allow the Court to deviate from the legislative preference regarding adoption." The record supports the juvenile court's findings. The court did not abuse its discretion in finding the benefit exception did not apply.

# DISPOSITION

The juvenile court's order terminating Mother's and Father's parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.